All right, so with that, we will call Lytle v. CEM Insurance Company, and we'll begin with Ms. Lee. Good morning, Your Honors. May it please the Court. I would like to kind of give you an outline of the three issues I would like to discuss this morning. The first is whether the district court properly granted summary judgment on Mr. Lytle's breach of contract claim. And the second issue is also whether the district court correctly or properly granted summary judgment on Mr. Lytle's DTPA claim. And the third is whether the district court, the ruling about the damages was proper. I just, I need to step back to this jurisdictional question we asked you all. So I'm just a tad confused about this. Are there two separate entities that are actually called Pronto Insurance Agency's LP and Pronto Insurance Company? No, ma'am. I don't, I think that might have been a misnomer. It's Pronto Insurance Agency LP, which was- Okay, so when you brought in Pronto Insurance Company, that's just a misnomer. That was a misnomer. Okay, so then that means that party is still there. Your Honor, I think we can concede that they are no longer a party to this case and that the plaintiff is not going to be pursuing cause of action against them. Okay. No, that's not how it works. Even if you think, ah, let me just focus on CEM Insurance or CEM or whatever they're called, I don't really care that much about Pronto, unless they're actually dismissed, was there a dismissal of them? Because they did answer. And if Pronto Insurance Company and Pronto Agency's LP or whatever are the same entity, in other words, there's not two separate companies and you sued the wrong one, then that company is still there until they are dismissed. So can you point to me where the dismissal is? There was no actual dismissal, Your Honor. I believe that they were, Pronto was a defendant when it was in the state court and then once it got, once it was removed to federal court, Pronto somehow got lost in the shuffle and never got brought back in and it was never discussed. Well, it's not a matter of bringing back in. That just isn't how it works. When you have A versus B and C and it's removed to the federal court, A versus B and C is still there and in fact, the title of the case still has Pronto in it. It had it in the district court. And that may be why the district judge did not grant a final judgment when summary judgment was granted for CEM. Typically, district judges, I'm sitting between two who could tell me more, generally do enter a final judgment when they think they've entered a final judgment. They don't just enter a grant of summary judgment. And it strikes me that way. So I mean, the problem is, however you feel I don't really care about Pronto, we still have to address the jurisdiction and it's striking me that we lack it. Well, I'm not really sure what to do at this point because when I got this case, it had already been appealed and there was already . . . I had to ask for an extension because the briefing deadline was getting close. So I'm not really sure what to do at that point other than maybe abate this appeal. But we can go ahead and proceed with the oral argument and then we can get a final judgment and supplement the record. Okay. So you're talking about a limited remand to the district court to address Pronto? Yes. And then you could dismiss Pronto at that point and then it would come back? Is that your argument? I think since we're all here, if we could proceed . . . No, no. I'm just saying on the limited remand that that's your point of the limited remand. I'm not saying you can't . . . you can make whatever argument you want. You're standing here. I'm not going to stop the argument. Right. But I'm just wondering. Okay. If you want to discuss the rest of your argument, we'll try to figure out what's going on with Pronto. Okay. Thank you, Your Honor. So the first issue that I wanted to discuss was the breach of contract. So CEM's argument here is that, well, we didn't breach the policy and Mr. Lytle can't show that we breached the policy because we paid for a like, kind, or quality engine. And it's MSJ. CEM focuses on interpreting the insurance policy, which is whether the policy pays for a new engine. I don't think that's a pivotal issue here. The pivotal issue is not whether the policy covers a new engine. Instead, the pivotal issue is whether CEM complied with its obligation to provide a like, kind, or quality engine. CEM's insurance policy specifies that the like, kind, or quality is an exclusion or limitation of coverage. Also in their answer, CEM pled the like, kind, or quality limitation as an affirmative defense. In their MSJ, CEM concedes that the like, kind, or quality limitation is an exclusion. Therefore, as an affirmative defense, the like, kind, or quality is CEM's burden to prove. As an affirmative defense, CEM has the burden to conclusively prove and submit evidence that the engine it had installed in Mr. Lytle's truck was a like, kind, or quality engine. But CEM did not meet this burden. There's no evidence that the engine CEM had installed in Mr. Lytle's truck was a like, kind, or quality engine. Rather, the only evidence in the record shows that, I'm just going to call this, it was a salvaged engine from the junkyard. I think there's no dispute about that. The only evidence in the record is that this engine was not a like, kind, or quality engine. Mr. Lytle testified that he saw the engine sitting on the floor at the repair shop after his truck had already been taken apart. He saw that it was a used engine. He could tell it was not a rebuilt engine, and there's no known history of the engine. So here we, and he didn't want that engine because he didn't know anything about the engine. So it's kind of like a car fax. You don't want to buy a car without knowing the history of what the car went through. You don't know if the car's been in a wreck. You don't know if it's previously been flooded. You don't know if there's any other damages to it. So that's why Mr. Lytle did not want this junkyard engine that they just plugged from the salvage station. CEM did not controvert any of this evidence. So because Mr. Lytle did not want this junkyard engine in his 2-year-old truck, he asked CEM to look into the issue and to reconsider a different engine. That's all he wanted. He just said, I don't want this engine. I don't think it belongs in my 2-year-old truck. My truck is pretty new. I've taken good care of my engine, and I just don't want this engine in my car. I just don't know anything about this engine. However, CEM refused to investigate and refused to consider a different engine, and instead, they went ahead and they paid the repair shop to install the junkyard engine. I think that based on this evidence, a jury could find that CEM breached his contractual obligation to repair Mr. Lytle's truck with a proper engine. The next issue I want to talk about is the DTPA. So the district court granted summary judgment on the DTPA claim because it said that the plaintiff must point to a specific misrepresentation made by CEM in order for there to be a DTPA violation. However, making misrepresentations to a policyholder is not the only way that an insurance company can violate the DTPA. An insurance company can violate the DTPA also by violating the Texas Insurance Code. The case law makes very clear that violating any part of Insurance Code Chapter 541 also constitutes a violation of the DTPA. An insurance company violates Chapter 541 when it fails to attempt in good faith to properly, fairly, and equitably settle a claim when the insurer's liability is reasonably clear and refuses to- What about this argument that really you all don't have any damages because all of your problems were failure to pay Exeter? Well, we feel that the DTPA does not require approximate cause, Your Honor. The DTPA only requires that CEM's actions be a substantial factor. So in other words, if there's evidence that CEM's acts or omissions started the chain of events that led to the repossession of Mr. Lytle's truck and eventually the damage to his credit, then that is sufficient to show causation here for the DTPA claim. An insurance company also violates Chapter 541 of the Insurance Code if it refuses to pay a claim without conducting a reasonable investigation of the claim. I don't think there's any dispute here that CEM has liability to pay for Mr. Lytle's damaged truck. I think their liability here is reasonably clear. They accepted the claim. But CEM's refusal to pay his claim without conducting a reasonable investigation on the appropriateness of the engine that they wanted to stall on his truck is a violation of Chapter 541. CEM ignored Mr. Lytle's many pleas to reconsider, to investigate, and instead CEM just paid the repair shop anyway to take apart Mr. Lytle's truck and install a junkyard engine, and this was all done without Mr. Lytle's authority or even any knowledge. Mr. Lytle does not recall ever getting an estimate, nor was he offered a check to allow him to go to a different repair shop to get his car fixed. Instead, CEM just paid the repair shop and the repair shop did the repairs. And because the repair shop had already taken his car apart, he was not able to take his truck to another facility for the repair. So it was just sitting disabled at the repair shop. By locking Mr. Lytle into using this particular repair shop, which is named Tepotex, and insisting on paying only for this junkyard engine, CEM also violated Texas Insurance Code Section 1952.301. That statute says that an insurer may not directly or indirectly limit coverage by specifying the brand, type, kind, age, vendor, supplier, or condition of the parts that may be used to repair a vehicle, or limiting the policyholder from selecting a repair shop to repair his vehicle. So the Berry case is, I believe, the only case that talks about Section 1952.301 and the policies behind it. It's a case that both CEM and I have cited in our briefing. And in that case, the Austin Appellate Court went through, why do we have this particular section? Why do we have Section 1952.301? And the court recognized that the reason why we have that is for policy reasons, because there was some testimony at the hearings about this statute that there were issues with used parts from junkyards, salvaged parts from junkyards being used in two, three, five-year-old vehicles that are not that old. And these used parts were not sufficient. Sometimes they didn't fit right. Sometimes they were structurally inferior. Sometimes there's no history of what happened with the part prior to it being installed. So there's policy reasons. And this is exactly why Mr. Lytle did not want this junkyard engine in his car. He didn't know anything about it. And lastly, I want to touch on the damages. So Mr. Lytle lost his policy benefits. He lost his truck. And his credit took a hit. So as I mentioned earlier, the DTPA only calls for a producing cause, not approximate cause. So CEM doesn't have to actually repossess the vehicle, and CEM does not actually have to be the one to report the vehicle as being laid on payments to the lender. So a consumer may recover consequential damages. But they're saying he was an intervening cause by not paying his monthly rates. Exactly. Exactly. And so what's your response to that? So my response is if they had investigated the engine to make sure that it was appropriate for his truck. So basically what happened was he took the truck to Tipo Tax, and it kind of sat there for a while. And during the time that he – well, he paid for the car before it went into the shop.  He made a few other car payments when the car was still in the shop. But because the car was in the shop and he doesn't have a whole lot of money, he needed his money to pay for other things. He needed to go to work. He needed to get a rental car so he can make a living. So he did miss a few payments. But there's no indication that executor, the lender, actually repossessed the cars because he wasn't making payments. So he tried – he did fail to make payments for a few months, but because he just didn't have the money to make the car payments on a truck that wasn't working because he needed the money to get a rental car so he can go to work. But it's the delay. It's CEM's delay in investigating the car, investigating the engine. And so this whole time that Mr. Lotto was waiting for CEM to investigate, in a few months had gone by, and the repair shop was ready for someone to pick up the vehicle, and the repair shop called the lender and said, hey, will you come pick this car up? And the lender went and picked it up. Okay. And we've settled with the lender. Okay. Your time has expired for now. You've saved some time for rebuttal. Thank you, Your Honors. Good morning, Your Honors. May it please the Court. I'm Julie Tebbets, and I represent CEM Insurance Company in this case. I will first address the jurisdictional issue. I do believe the Court has jurisdiction because in the second amended complaint, they actually named a wholly different entity. But is that a different? There is a Pronto Insurance Company that is separate from the Pronto Agencies, whatever, whatever LP? There may be. I don't know. Okay. Well, that matters because it could be a misnomer. If somebody sued Katherine Haynes and they meant me, Katharina, that's a misnomer. If they meant some other lady who is Katherine Haynes, then that is not. Then that's a problem. Then that's what you're arguing. And my point being is there may be an entity out there called Pronto Insurance Company. It is not an entity related to the Pronto that my firm represented. It's not related to this case, is it? I don't know if it's related to the case. Okay. But the Pronto that you did represent or that your colleague represented is related to the case. It is related to the case. Okay. So when they list Pronto Insurance Company in this case, why would we not have to construe that as a misnomer? Because they actually, in the original complaint, if you look at the three complaints that were filed in the original complaint, they listed this Pronto Insurance Agency, LLP. And then in the subsequent pleadings, they actually in the body of the pleadings removed those references and put in Pronto Insurance Company. Well, that's because, you know, when you read their documents, at the top it says Pronto Insurance, and so maybe they thought they were supposed to say that. But we don't know that it's not a misnomer. Isn't this something the district court has to determine? I don't believe so because, again, when this started, when the second amended complaint was filed, it was filed in state court. And under the state court case law, just simply listing somebody in the style of the suit does not mean that they are . . . Yeah, but misnomer is Texas law. I'm well familiar with it. I used to be a state district judge. I'm well aware of that. And that would be different from a totally different company that she meant to sue, from, you know, suing John Doe versus Jane Doe. But, again, I think the distinction here is that the plaintiff at that time, so the appellant, actually went through the steps of changing the name of the entity that they were pursuing in the body of the pleadings and actually purported to serve the petition through . . . Through the lawyer for . . . So that, again, tends to suggest a misnomer or just trying to write the more correct name. That's a misnomer, not a different defendant. But, again, we took the step of alerting them at the time that we could not accept service for this entity of Pronto Insurance Company because we do not represent them, and the plaintiff took no steps to serve them or to attempt to amend their pleadings, to correct the issue. And so it is my opinion that Pronto Insurance Companies is an unserved defendant, therefore . . . Well, we don't even know if they exist. So the other world is misidentification. So the question is misnomer versus misidentification, and there's no indication that they were trying to bring in somebody completely unrelated to this case. And I think, I mean, I'm speculating here, but I think that's because they've also now amended in the third to bring in CEM, who was the actual insurance company that issued the policy here. Pronto was essentially a third-party administrator that was administrating the policy on behalf of CEM. And so Pronto itself did not issue a policy. Pronto did so it could not have reached a contract. It owed no duty to the insured. And so by naming CEM, I think it was clear that the plaintiff was proceeding against the actual insurer and was dropping any allegation to Pronto, who, again, I don't believe is present anymore because of the removal. Well, I'll let you talk about the merits, but I do think this is very odd. Well, so on the merits of this case, what the plaintiff is actually asking you to do is to rewrite not only this insurance policy, but basically to rewrite Texas statute. And I don't think that there's any justification for that. You know, I would note in Texas, the auto policies are form. They're state-mandated forms that are generated and created. And the section of the insurance code . . . But are you denying that this is your burden, to show that the engine you offered was proper? I don't believe that it is my burden, and here's why. It is not an exclusion. It's not an affirmative defense, even though you put it as one. We listed it under the category of affirmative defenses, but I really don't think that it is. If you look at the actual policy, we're specifically looking at Section D, and in Section D, there is a heading for exclusions, and it lists 1 through 40, and it lists all of the exclusions there. The next section is limits of liability, and that is where the language regarding the like, kind, or quality exists, and under the limits of liability, we start renumbering again, beginning with 1, 2, 3. So it's very clear that the exclusion section is a completely different section of the policy, and then what we're looking here is limits of liability, and limits of liability, again, would go to where it is the plaintiff's burden to prove that there is coverage for the requested benefit that they're trying to . . . What's your best case on that? It's just in the . . . I don't guess I really have a case, other than the general case law. Your best citation. It would be the case law regarding how you construe a policy that you look at. I'm well aware of that, but I'm asking for a case that would specifically address what you just said, that this section of limits of liability shows that they have the burden. I don't know that I have that off the top of my head, Your Honor. But, you know, regardless, under this like, kind, or quality, I think that the plaintiff is trying to kind of misinterpret that phrase, and what the Berry case that we both rely on indicates is that like, kind, or quality does not mean you have to put the same exact engine in. If you look at the great Texas County Mutual Insurance Company v. Lewis case, what it says is like, kind, or quality does not mean the same thing. It means that that part is fit for its intended purpose. And so, in other words . . . But they're kind of debating that. I mean, this is a summary judgment. Why isn't that a fact issue, whether a junk engine that's 88,000 miles is a replacement for a truck that was a year or two old? Well, a couple of things I would point out to that is, Your Honor, I don't believe that the actual summary judgment evidence shows that there was 88,000 miles on this. I think that if you look at the record citations to that, that is referring to argument made by the counsel who drafted the response to the motion for summary judgment. So I don't believe there's any actual evidence of this 88,000-mile engine. Additionally, I would point out, in the record, there is even evidence that plaintiff or appellant's vehicle had over 111,000 miles on it. And I found that at ROA 605, which was an estimate that was put together by TIPA Techs when they were evaluating the car. And my concern about what the plaintiff and what the appellant is proposing here is I think that this really will completely turn the insurance industry and even the statute on the head, because the reality is the insurance companies don't repair cars. Insurance companies, they pay for a car repair. An insurance company doesn't go out and say, okay, that's the engine that we want to use. No, we don't want to use this engine. We want to use another engine. The auto industry or the auto repair shop is the one who picks the engine. What even the policy reads is that the carrier can pay, based on an estimate, based on the typical cost of repair for a like, kind, or quality, using even the non-OEM parts. And, again, the Berry case is very clear that the reason that this statute came into place was because some insurers were requiring an insured to actually use an old part in their car if they didn't want it. What this statute says is you as the car owner can pick whatever part you want to use to go in your car, but just know that if it's going to be anything above what the carrier is required to pay, you have to pay for it yourself. So that was the purpose behind the statute coming into place, is it was giving the actual car owner the ability to control what goes into his car. But your opponent said they weren't given that option. So if you actually, again, look at the summary judgment evidence, what comes out is the appellant admits, one, he never spoke to CEM, two, he said no one, he doesn't remember how he got to Tippa, Texas. He doesn't remember any conversation that he had with anyone at Pronto. He did have his own personal agent, who, again, is not sued here in this lawsuit. She's the one that he contacted after the flood with what to do. The own personal agent, which is Altrae Insurance Brokerage, I believe it's what it is, she's the one that actually placed the insurance policy with him. So all of his contact was directly with his own personal agent. And, again, so in the argument of counsel in the briefing, there are statements that he wasn't given this option, but in his own testimony in the summary judgment evidence, the actual evidence, he admits that he doesn't know how he got there, doesn't remember how he got there, and he even says that he doesn't even remember if he asked for a new engine, if he asked CME for a new engine. And so that's what the actual summary judgment evidence shows. And for that reason, I don't believe that the plaintiff has raised or the appellant has raised an actual question of material fact that would preclude the granting of summary judgment in this case. You mentioned briefly the... I'm sorry, my counsel mentioned the DTPA as well. And, you know, admittedly, the judge's decision does state that there is no misrepresentation that has been alleged, and that was part of the basis of his opinion. But I think it's also significant that the third amended complaint does not actually raise Chapter 541 of the Texas Insurance Code. So that is the argument that has been made here today and in the briefing, but 541 of the Texas Insurance Code was not addressed below. Additionally, the Menchaca decision, I think, is very crucial in this case because what the Menchaca decision held is that an insured cannot recover statutory damages when there is no entitlement to the actual policy benefits. And, again, if we go back and we look at the policy, and the policy says the insurance company is only required to pay for non-OEM parts, so for used parts, if the insurance company is only required to pay for that, and, in fact, we did pay for that, as found in ROA 299 is the listing of the payments. So the insurance company did issue the payments in this case, and there's no indication that the appellant is entitled to any further policy benefits under the policy. So if he's not entitled to get any policy benefits, then the DTPA cause of action fails as a matter of law as well. With regard to the damages issue, I do think it is significant that the appellant stopped payment of his car payments. He, in this lawsuit, originally sued Exeter, which was the finance company, as well as pursuing this claim for the insurance policy benefits. He claims in his damages in discovery, which, again, is in the summary judgment evidence found at ROA 374 to 375, he claims for the loss of truck, which $37,000. Well, the loss of truck was due to the repossession due to the nonpayment of his monthly bill. And I'm not aware of any provision that allows you to not pay your car payment just because your car is in the shop or your car is broken down. You still have that obligation to go ahead and issue that car payment. And so I don't believe that you can attribute any damage for the loss of truck to CEM's refusal to pay anything more than what is there required to do under the policy. He also made a claim for mental anguish, but in his deposition, which is also in the summary judgment evidence, he admitted that he had no mental anguish, so you can't recover for mental anguish there. We've already discussed the statutory damages based on the Menchaca case, and then he had a claim for attorney fees. But, again, if there's no breach of contract available, then you can't get any attorney fees. So the claimant had the appellant has no damages that are attributable to any conduct of CEM in this case, and because damages is a component of any cause of action, again, we believe that the court was appropriate in granting summary judgment. And I think it's also significant that the truck is no longer owned by appellant. Because the truck was repossessed by Exeter, he no longer owns that truck. So, in a way, it really is irrelevant whether or not a new engine or a repurposed engine was put into that truck, because he never possessed the truck after the repairs were made. And so, again, I think that is another factor that goes to damages in this case. It is very clear that CEM paid policy benefits. We have paid what we were required to under the policy, and the insurance code provision is basically incorporated. If you look at the insurance code provision, the 1952.301, it's echoed in that limits of liability section of the insurance policy, which, again, is a state-mandated form of a policy. Because the appellant elected not to pursue and pay for a new engine that he was entitled to pay for, that does not establish that CEM did anything wrong in this case, and I think that the trial court accurately granted summary judgment here. I am open to additional questions if the court has any. Otherwise, I will give back my time.  Thank you, Your Honor. Okay. What's your response to this was not an affirmative defense, even though it was listed as such? I have case law for you. Great. Let me hear it. I will cite them. I have a case called Latigo Plaza, Inc., versus Travers-Lloyds Insurance Company, and the site is at 2014, Westlaw, 12489699. I also have another case, Allen versus State Farm-Lloyds. It is at 2017, Westlaw, 3275912. And I also have another case called Crisp versus Security National Insurance Company, and that site is 369 Southwest 2nd, 326. And in all three of those cases, those courts found that it was the insurance carrier's burden to show that it complied with the like, kind, and quality provision. So they may not be they I don't believe that they are all automobile insurance cases. One of them was, I believe, a property insurance case, and it was about roofing materials and whether the roofing materials was a like, kind, and quality to the policyholder's original roof. I believe that was Latigo Plaza. But those three cases, the court did make clear that it is their burden. Okay, and then what about the argument that you really haven't established damages, given where life is today? Well, I kind of will go through the sequence of events here just real quick. So after Mr. Lyles sustained flood damage to his truck, CEM accepts the claim, and we don't know how he got to TIPO tax. So there's a fact issue right there. He says there is some implication in his depo testimony that's on the record that it was on the insurer's suggestion. So we don't know who insurer means. We don't know if it's his insurance agent. We don't know if it's CEM. There's just no that's all we have in the record. He just says the insurance, the insurance. So we've got a fact dispute right there. He saw that he took his truck to TIPO tax. I mean, but Little can't create his own fact issues by saying he didn't know what he said. Well, he's the only one who's been deposed. His insurance agent hasn't been deposed. No one from CEM's been deposed. No one from Pronto's been deposed. So we don't know who told him how he found out about TIPO tax. We don't know who ordered the tow truck. We don't know any of that information because this summary judgment was granted before any of that could be discovered. So Mr. Lytle's memory, maybe not the greatest. He just doesn't remember how he got there. And so if we were allowed to depose other people, maybe we could kind of ferret that out and figure out how he even got to TIPO tax in the first place. So he goes to TIPO tax with the tow truck, and he checks on his truck there. He sees that his truck's been taken apart without his approval. He sees a salvaged engine sitting in the shop on the floor. It's got a tag that says it comes from, you know, Billy Bob's Junkyard. So he knows it's a junkyard engine. He complains to CEM, and he asks CEM to look into the junkyard engine and consider another engine. And there's evidence that CEM knew that he asked for another engine. So believing that CEM would investigate, he just kind of left it in CEM's hands and thought, okay, well, while I'm in good hands, they're going to investigate and make sure that engine is appropriate for my truck. But instead of investigating whether the engine is light, counter-quality, or even fit for the purpose to be put in his truck, in his 2-year-old truck, CEM instead just pays the repair shop to install the engine. And so the repair shop installs the engine, again, without Mr. Lytle's approval. He didn't even know what's going on. This whole time he really wasn't informed. He didn't know what was going on. Next thing you know, he gets an invoice from Tipo Tax charging him an additional $6,500 to get his car out. Mr. Lytle is low income. He doesn't have that kind of money, so he wasn't able to pay it. Tipo Tax decided, okay, I'm ready for this truck to get out of my lot, so I'm going to contact someone to get rid of this truck. So my understanding is they called Exeter, the lender, and the lender came and picked it up. And there is evidence in the record, Your Honors, that Mr. Lytle was making payments on the truck. So the truck was repossessed in October of 2019. Mr. Lytle actually made two car payments in October of 2019. That is in Record 378. And so his credit took a hit. He didn't really know what was going on, and he was not able to get another car because his credit took a hit. He could not get another vehicle with the same kind of car payments. Okay. All right. Thank you both for your arguments. The case is now under submission, and we will.